Jerry Bernard **WINSTEAD**, Jr., Appellant,

v.

**COMMONWEALTH of Kentucky**, Appellee.

**No. 2007-SC-000425-MR.**

Supreme Court of Kentucky.

May 21, 2009.

Emily Holt Rhorer, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, James Coleman Shackelford, Assistant Attorney General, Office of Criminal Appeals, Attorney General's Office, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice ABRAMSON.

Jerry Winstead appeals from a May 21, 2007 Judgment of the Daviess Circuit

Court convicting him of murder and of first-degree robbery and sentencing him to concurrent prison terms, respectively, of life without the benefit of parole and of twenty years. The Commonwealth alleged, and at his March 2007 trial the jury found, that on January 22, 2005, Winstead shot and killed Richard Roberts in the course of stealing a substantial amount of cash from a small safe in Roberts's bedroom. On appeal Winstead contends (1) that he was denied his right to represent himself at trial; (2) that he was denied his right to an adequate *voir dire;* (3) that the trial court erred when it refused to strike one of the venire members for cause; and (4) that the trial court erred when it permitted one of the Commonwealth's witnesses to bolster her own testimony. Finding no reversible error, we affirm.

### RELEVANT FACTS

Roberts's sister Samantha discovered Roberts's body lying on his bedroom floor near his opened safe at approximately 1:00 pm on January 22, 2005. She had talked to him on the phone about an hour before. He had been shot one time in the neck and was pronounced dead at the scene. The police investigation soon focused on Winstead. He and Roberts both lived on Crittenden Street in Owensboro, near each other, and the police learned that the nineteen year-old Roberts had engaged in selling street-level amounts of marijuana and that Winstead had been one of his regular customers. Winstead was aware that Roberts kept the proceeds of his drug dealing in the bedroom safe and had remarked to several acquaintances that he knew of a near-by drug dealer who would be easy to rob. Just prior to the shooting, Roberts had amassed in excess of $3,000.00. The police also learned that Winstead had been unemployed for several weeks before the crime, that just before the crime he faced imminent eviction from the residence he shared with his half-sister and step-father,

and that immediately after the crime he had paid cash for a new apartment and had gone on a cash-financed shopping spree amounting to at least $2,000.00. Following Winstead's arrest, the police searched his residence and found an old suitcase containing a pair of jeans and a pair of gym shoes. On the jeans and on one of the shoes were spots of blood, which DNA analysis established was consistent with Roberts's DNA. The police also seized a .357 magnum caliber handgun that belonged to Winstead's step-father and to which Winstead had had access. The gun also bore a spot of Roberts's blood, and ballistics testing showed that bullet fragments removed from Roberts's body and discovered at the scene could have been fired from that gun.

Winstead was arrested on January 27, 2005 and was interrogated that evening. He denied any involvement in the shooting or the theft until detectives confronted him with their discovery of the apparently bloodied clothing. When Winstead denied knowing how the clothes had gotten into the suitcase, the detectives threatened to arrest his half-sister as the only other person who could have put them there. Winstead then claimed to have been visiting at Roberts's apartment the day of shooting when a person he did not recognize arrived and went with Roberts to the bedroom. A short time later he heard a gunshot and ran to the bedroom, where he nearly tripped over Roberts's prone body and found the stranger taking money from the safe. When the stranger threatened to shoot him, too, Winstead punched him so hard that the stranger fell and was knocked unconscious when his head hit the safe. Winstead then grabbed a portion of the money—about $1,300.00 he claimed—and ran home, where it was he who put the blood spattered clothes into the suitcase. The video recording of Winstead's interrogation was played at trial. The Common-

wealth argued that while much of Winstead's statement was obviously untrue, it did place Winstead at the scene and in possession of the bloodied clothes and that together with the evidence summarized above it proved that Winstead had killed Roberts in the course of robbing him.

Winstead testified on his own behalf and denied having had anything to do with the killing or the theft. He claimed that he was with his half-sister at the time of the shooting. The money for his new apartment and for his shopping spree had come from his own drug dealing, he asserted, and his statement to the police in which he placed himself at the scene and admitted concealing the blood-spotted clothes, was a pure fabrication meant only to remove suspicion from his half-sister and to prevent her arrest. In fact, he claimed, he did not know how the clothes had gotten into the suitcase, but noted that his step-father had also had access to the suitcase and the gun. His half-sister corroborated his claims that they had been together when the crime occurred and that they had raised money for their new apartment by selling crack cocaine.

As noted above, the jury found Winstead guilty of both murder and robbery, whereupon the Commonwealth argued that because Winstead's crime was an aggravated killing—a killing in furtherance of a robbery—it warranted the death penalty. The jury recommended instead, however, that Winstead be sentenced to life without parole, and that, as noted, is the sentence the trial court imposed.

### ANALYSIS

### I. Winstead Was Not Denied His Right To Represent Himself.

The first claim Winstead makes on appeal is that he was denied his right to represent himself. Winstead was indicted on March 8, 2005 and was arraigned on March 24th of that year, prior to which time, apparently, public advocates had been appointed to represent him. Assistant Public Advocate Joseph Bennett entered his appearance to assist with the case on March 31st. At the end of September 2005, Winstead filed three *pro se* motions seeking discovery from the Commonwealth, and on October 3rd he filed a fourth motion complaining that the discovery provided to him to date had excluded several items he believed he was entitled to. The trial court forwarded the motions to counsel for both sides, and at a hearing on October 7, 2005, Winstead stated that he had asked counsel (apparently Bennett) to file the motions on his behalf, and that when counsel had refused, he (Winstead) had decided to take the matter into his own hands. The court informed Winstead that as long as he had counsel of record the court would not entertain *pro se* motions. Motions Winstead filed himself would be forwarded to counsel to be handled as counsel saw fit. Winstead complained that he found it difficult to work with counsel (again, apparently Bennett), but the court informed him that although he was entitled to an attorney, he was not entitled to the attorney of his choice, and in the court's estimate the team representing Winstead was highly competent.

There the matter stood, apparently, until November 21, 2005, when Winstead filed another *pro se* motion, this one seeking dismissal of the indictment for lack of evidence and monetary compensation for what Winstead characterized as his unlawful incarceration. He accompanied the motion with a letter to the court in which he again complained of counsel's unavailability and his failure to share with Winstead several items of discovery. The letter includes the following passage regarding Winstead's relationship with counsel:

I can not [sic] help my attorney build a proper defense if evidence is withheld

from me. I have tried reasoning with him, but it has done no good. He has basicly [sic] told me he felt I was guilty and there is overwhelming evidence stacking up against me. I have failed to see his point or the evidence. Unless there is evidence being held from me. [sic] I honestly feel my attorney is not working with and or for me in this case. In fact, I feel as if he is working on the behalf of the Commonwealth. I honestly feel I have a better chance of defending myself. I am not completly [sic] intelagent [sic] on all legal matters. I feel the O.P.D. is trying to frame me. I would be able to prove it if my attorney would work with me, but he refuses to do so. I have been trying to settle this matter for the last ten months, but have not been able to do so.

At a hearing the next day, the court again told Winstead that he was "wasting his time" filing *pro se* motions, as they would only be forwarded to counsel. In June 2006, Sheila Kyle–Reno replaced Bennett on Winstead's defense team, and it was she and Robert Sexton who represented Winstead at trial. Winstead now contends that with his *pro se* motions and the November 21, 2005 letter to the court he invoked his right to represent himself, and that the court subsequently erred by failing to conduct the hearing mandated under *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) and *Hill v. Commonwealth,* 125 S.W.3d 221 (Ky. 2004). Because Winstead's complaints about counsel did not amount to an invocation of his right to proceed *pro se,* the trial court did not err.

■ The Sixth Amendment to the United States Constitution and Section Eleven of our Kentucky Constitution grant criminal defendants both the right to be represented by counsel and, conversely, the right to waive counsel and to conduct their own defense. *Faretta, supra; Hill, supra.* Because the assistance of counsel is generally regarded as a crucial component of a fair trial, the right to that assistance has been characterized as a fundamental constitutional right. *Hill,* 125 S.W.3d at 225 (citing *Jenkins v. Commonwealth,* 491 S.W.2d 636 (Ky.1973)). For the same reason, courts indulge "every reasonable presumption against a waiver of counsel." *Buhl v. Cooksey,* 233 F.3d 783, 790 (3rd Cir.2000). To overcome that presumption and conduct his own defense, a defendant must clearly and unequivocally seek to represent himself. *Deno v. Commonwealth,* 177 S.W.3d 753 (Ky.2005). It is not enough to express dissatisfaction with counsel or to request different counsel; the defendant, rather, must unequivocally ask to proceed *pro se. Id.; Faretta, supra.* If a defendant unequivocally invokes his right to defend himself, the trial court is then obliged to conduct a hearing to ensure that the defendant's waiver of the right to counsel is both knowing and voluntary. *Hill, supra.* The court's obligation does not arise, however, unless and until the defendant clearly invokes his *pro se* right. Because that right does not implicate constitutional fair-trial considerations, moreover, the trial court has no *sua sponte* duty to inform the defendant of his right to proceed *pro se. Munkus v. Furlong,* 170 F.3d 980 (10th Cir.1999).

■ We are not persuaded that Winstead's *pro se* motions and his letter to the trial court overcame his presumed reliance on counsel. The motions and the letter appear to be an attempt to enlist the trial court's aid in compelling counsel to provide discovery, or even perhaps a request to replace counsel with someone less insistent on the realities of Winstead's serious predicament. Those documents stop short, however, of seeking to dispense with counsel, in whole or in part, and to proceed *pro se.* Although Winstead asserted that, "I have a better chance of defending myself,"

684

this was not so much a request to do so as it was a way of underscoring what he perceived as counsel's lack of effort, an assertion that his counsel's efforts had been no better than a layman's. That Winstead did not, in fact, seek to represent himself is clear from his following statements that he was not schooled in the law and that with an attorney "who would work with me" he could mount a defense. This conclusion is confirmed by the fact that Winstead lodged no further complaints about his representation after Bennett was replaced. Because the trial court did not disregard an unequivocal request for self-representation and had no duty otherwise to advise Winstead of his right to proceed *pro se,* Winstead is not entitled to relief on this ground.

## II. Winstead's Jury Was Fairly Selected.

Winstead next contends that he was denied his right to fair jury selection procedures. He complains that he was denied an adequate opportunity to canvas the venire regarding racial prejudice and also that the trial court erred when it refused to strike for cause a panel member who indicated that he would not consider mitigating circumstances. We review the trial court's conduct of *voir dire* under the abuse of discretion standard. *Thompson v. Commonwealth,* 147 S.W.3d 22 (Ky. 2004) (scope of *voir dire* ); *Sherroan v. Commonwealth,* 142 S.W.3d 7 (Ky.2004) (strikes for cause).

### A. Winstead Was Not Denied Meaningful *Voir Dire.*

This was a capital case in which the defendant was African–American and the victim Caucasian. Winstead had also been involved in romantic relationships with Caucasian women. Under these circumstances, as Winstead correctly notes, both the Fourteenth Amendment to the United States Constitution and RCr

9.38 gave him the right to question potential jurors regarding racial prejudice. *Turner v. Murray,* 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986). At the beginning of individual *voir dire,* Winstead asked one of the panel members whether she agreed that in this State's history racial prejudice had been, and that it continued to be, a serious social problem. He also asked how she would react to an interracial romantic relationship in her own family. The Commonwealth objected to these questions as straying from the issues in the case. Defense counsel argued that because panel members were apt to be reluctant to admit racial bias or even to be unaware of their bias, he should be allowed questions somewhat more likely to elicit racial attitudes than direct questions about prejudice. The court agreed with the Commonwealth, however, and essentially limited *voir dire* on race to the following questions:

Does the fact that the defendant is an African–American have any bearing on your judgment in this case?

Would the fact that individuals in this case were involved in interracial relationships have any bearing on your judgment?

Would the fact that the defendant is African–American and the victim Caucasian have any bearing on your judgment?

Winstead contends that the court unduly restricted the *voir dire* and thus denied him his right to an impartial jury. We disagree.

Although, as noted, Winstead had a constitutional right to canvas the panel concerning race (or at least to have the panel canvassed), the Supreme Court has made clear that as long as the subject of race is raised and the panel members put upon their oath, the manner of the canvassing lies within the trial court's very

broad discretion: "[T]he trial judge retains discretion as to the form and number of questions on the subject, including the decision whether to question the venire individually or collectively." *Turner*, 476 U.S. at 37, 106 S.Ct. 1683. For *voir dire* questions to be constitutionally compelled, the Court has explained, "it is not enough that such questions might be helpful. Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair." *Mu'Min v. Virginia*, 500 U.S. 415, 425–26, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991).

Winstead's proposed questions aimed at probing the panel members' racial attitudes do not meet this standard. Even if Winstead's counsel deemed them helpful, we cannot say that Winstead's trial was rendered fundamentally unfair or that the trial court abused its discretion when it focused *voir dire* on the particular racial facts confronting the jurors in this case. The questions allowed by the court gave it and the parties an opportunity to assess not only the panel members' verbal responses to the racial aspects of the case, but their demeanor as well, and thus provided an adequate basis both for challenges for cause and for peremptory strikes.

■ The result is no different under RCr 9.38. It is certainly true, as Winstead notes, that "[t]here can be no question that an adequate voir dire examination is essential to the seating of a fair and impartial jury." *Woodall v. Commonwealth*, 63 S.W.3d 104, 116 (Ky.2001). Under our rule, however, as under the federal Constitution, "[t]he extent of direct questioning by counsel during *voir dire* is a matter within the discretion of the trial court." *Fields v. Commonwealth*, 274 S.W.3d 375, 392 (Ky.2008) (citation and internal quotation marks omitted). For the reasons discussed above, we are not persuaded that the trial court abused its discretion in this case.

## B. The Trial Court Did Not Abuse Its Discretion When It Refused To Strike A Potential Juror For Cause.

■ Nor did the trial court abuse its discretion when it refused to strike juror 29 for cause. At the outset of *voir dire*, the trial court informed the potential jurors that if they found the defendant guilty they would be asked to decide upon one of five authorized penalties. The jurors were shown a list of these penalties, ranging from twenty years to death. The court informed them that in fixing a penalty they would also be asked to consider any aggravating or mitigating circumstances and explained the meaning of those terms. During individual *voir dire*, each potential juror was asked if he or she could consider the full range of penalties and whether he or she would consider mitigating evidence. In the course of his examination, Juror 29 stated that he would consider the death penalty but would not automatically vote to impose it, that he could imagine circumstances in which imprisonment for twenty years would be an appropriate punishment for murder and robbery, and that he would consider evidence offered in mitigation of the offense. When defense counsel asked if he would take the facts of the defendant's life into consideration, Juror 29 said that he probably would, but he could not be sure until he knew the facts of the case. Defense counsel then asked if the defendant's poverty and family history would bear on his decision, and Juror 29 replied that they would not. The court made sure that Juror 29 understood that the question was not whether those factors would bear on the defendant's guilt but whether they would bear on his punishment, and Juror 29 reiterated that poverty and family background would not affect his sentenc-

ing decision. At that point defense counsel moved to have Juror 29 struck for cause. Counsel argued that Juror 29's expressed attitude toward poverty and family background amounted to a disqualifying bias against mitigation. The court took the motion under advisement and ultimately denied it. At the conclusion of *voir dire,* Winstead used a preemptory strike to remove Juror 29 and preserved his objection to the trial court's ruling by otherwise exhausting his preemptory challenges. *Shane v. Commonwealth,* 243 S.W.3d 336 (Ky.2008). He contends on appeal that the trial court's refusal to strike Juror 29 for cause infringed his constitutional right to a jury able to consider mitigating circumstances. We disagree.

The United States Supreme Court has held that under the Eighth and Fourteenth Amendments to the United States Constitution a capital defendant is entitled to an individualized sentencing by a jury allowed to consider and give effect to any mitigating evidence that the defendant can produce. *Penry v. Johnson,* 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001); *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). In furtherance of that right, the Court has also held that such a defendant is entitled to have removed for cause any potential juror so biased in favor of the death penalty that he would automatically vote for that penalty regardless of any mitigating evidence. Such a juror, the court explained,

> will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the

Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views.

*Morgan v. Illinois,* 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). A potential juror should be disqualified, therefore, who would automatically impose the death penalty and give no consideration to mitigating circumstances.

Winstead would expand this rule to disqualify a potential juror who, like Juror 29, would give no weight to a particular mitigating factor. That is not what the Supreme Court has held, however, and in *Sherroan,* 142 S.W.3d at 14, we rejected a similar invitation to expand upon the Supreme Court's rulings. In that case we rejected a claim that *voir dire* into particular mitigating factors was constitutionally mandated and explained that a capital defendant's right to individualized sentencing "does not entitle [him] to jurors who are bound to *weigh* mitigating evidence in his favor." Because Juror 29 indicated that he would not automatically impose the death penalty but could conceive of mitigating circumstances that would justify the minimum penalty and that he would consider mitigating evidence, the trial court did not abuse its discretion in ruling that he was not disqualified under *Morgan* and related Supreme Court precedent. The fact that Juror 29 was disinclined to see poverty and a difficult family life as factors mitigating murder and robbery did not betray an attitude so closed to all mitigation as to suggest a prejudgment on the merits and so does not undermine the trial court's decision.

Again, the result is no different under our rules. RCr 9.36 provides that "[w]hen there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused as not qualified."

In *Sherroan, supra,* we noted that a disqualifying bias need not be imputed to the fact that "a juror may favor harsher penalties." *Id.* at 16. Similarly, Juror 29's unwillingness to say that he would find mitigating the defendant's poverty and family background did not indicate that he was incapable of rendering a fair verdict on the evidence. He was not obliged, after all, to weigh that particular evidence in Winstead's favor, and otherwise he indicated that he would consider the full range of penalties and would consider as well the facts of Winstead's life. The trial court did not abuse its discretion under the rule when it declined to strike Juror 29 for cause.

### III. A Witness's Self–Bolstering Testimony Did Not Render Winstead's Trial Unfair.

 Finally, Winstead contends that his trial was rendered unfair when one of the Commonwealth's witnesses was permitted to bolster her own testimony. Kayla Richter, who was fifteen-years-old at the time of the crime, was acquainted with the victim, Roberts, through Roberts's sister Samantha, with whom Richter was friends. Richter, along with another young friend, accompanied Samantha to Roberts's apartment on the day Roberts was killed, and at trial she described the discovery of Roberts's body. She testified that Samantha had gone into the apartment by herself to drop off a couple of DVDs and to invite Roberts to go with them for something to eat and that moments later she had come running out crying hysterically that her brother had been injured. The two friends then accompanied Samantha back into Roberts's apartment where the three of them witnessed the body and realized that Roberts had been killed. Richter remembered the other friend crying out, "Shut the safe! Shut the safe!" but she could not remember whether they shut the safe or not. Otherwise, she testified, they had not touched anything, had not removed any money from the safe or the apartment, had not seen anyone else in the apartment, and had not seen a gun. Samantha called 911 on her cell-phone, and the three of them waited on the apartment's front porch for the police. Officers arrived within a very few minutes and eventually took the three girls to police headquarters for questioning. Richter testified that she gave a statement to the police that day, that it was essentially the same as her testimony, and that it had been truthful. The prosecutor then completed his questioning of Richter by asking whether the police officers had tested her for gunshot residue, whether she had seen anyone with a gun, and whether she had seen any money in Roberts's apartment.

Before defense counsel commenced her cross-examination, she moved to have Richter's testimony struck on the ground that Richter's police statement had not been provided in discovery. The Commonwealth explained that Richter's statement had not been recorded, apparently because she was a minor at the time, but that otherwise the discovery materials had duly noted her interview. Winstead then renewed his motion to strike on the ground that as there was no way to explore the alleged prior statement, reference to it was improper and also on the ground that Richter should not have been permitted to characterize the prior statement as truthful. The trial court denied the motion.

On appeal, Winstead contends that Richter's testimony about her prior statement amounted to improper self-bolstering and entitles him to a new trial. Although we agree with Winstead that Richter's testimony about her prior statement was improper, the impropriety does not necessitate relief.

Kentucky Rule of Evidence 801A(a)(2) provides that a witness's out-of-court prior consistent statement is not admissible unless "offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." Under this rule and KRE 802 (the rule against hearsay), a witness's out-of-court prior consistent statement is not admissible merely to corroborate the witness's in-court testimony. Moreover, as we explained in *Dickerson v. Commonwealth*, 174 S.W.3d 451 (Ky.2005),

> [w]e perceive no conceptual distinction between testimony that repeats the witness's prior consistent statement verbatim and testimony that the witness previously made statements that were consistent with her trial testimony. Either way, the evidence is offered to prove that the declarant's trial testimony is truthful because it is consistent with her prior statements.

*Id.* at 472 (citing *Smith v. Commonwealth*, 920 S.W.2d 514 (Ky.1995)). Richter's testimony about her prior statement to the police was improper under these rules, and the impropriety was compounded in this case when Richter was asked to characterize her prior statement as truthful.

Winstead is not entitled to relief, however, for a couple of reasons. First, counsel did not properly preserve this matter for review. KRE 103 and RCr 9.22 require that objections to the admission of evidence be both timely and specific. As Professor Lawson notes, the general rule is that an objection is not timely unless it is made "as soon as the basis for objection becomes apparent." Lawson, *The Kentucky Evidence Law Handbook (Fourth Edition)*, p. 36 (2003) (citing *Sallee v. Ashlock*, 438 S.W.2d 538 (Ky.1969) and *Williams v. Commonwealth*, 602 S.W.2d 148 (Ky.1980)). *See also*, 21 Wright and Graham, *Federal Practice and Procedure: Evidence 2d*, § 5037.1 (2005) (noting that

under the very similar federal rule, to be timely the objection must be raised as soon as the basis for the objection is, or reasonably could be, known to the objector.). If requested by the trial court, moreover, the objector must also specify the ground for the objection, and a different ground will not be deemed preserved for appellate review. *Fairrow v. Commonwealth*, 175 S.W.3d 601 (Ky.2005). Although these rules permit some leeway to allow for the demands on counsel in the heat of trial, *Wilson v. Commonwealth*, 403 S.W.2d 705, 707 (Ky.1966) (an objection "two questions late" deemed timely), compliance is generally required both in fairness to the party offering the evidence and to give the trial court the opportunity to remedy any errors in the proceedings. *Olden v. Commonwealth*, 203 S.W.3d 672 (Ky.2006).

Here, Winstead's objection to Richter's testimony about her prior statement was neither timely nor specific. Counsel did not object until after Richter had been asked several additional questions about the gunshot residue test and about whether she had seen either a gun or money at Roberts's apartment. By that point it was certainly within the trial court's discretion to deem the objection untimely. Counsel's objection, moreover, was primarily based on the alleged discovery violation, not on the rules limiting the admissibility of prior consistent statements. Even counsel's "bolstering" argument did not focus on the prior statement itself as inadmissible, but rather on Richter's characterization of that statement as truthful. The objection, in other words, did not direct the trial court's attention to the ground of objection advanced on appeal.

Even if the matter was deemed preserved, moreover, Winstead would not be entitled to relief because the purported error was harmless. RCr 9.24. A non-

constitutional evidentiary error may be deemed harmless, the United States Supreme Court has explained, if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error. *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). The inquiry is not simply "whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Id.* at 765, 66 S.Ct. 1239.[1] Winstead contends that the error should not be deemed harmless because Richter's testimony bore significantly on the question of whether Samantha, who was involved in her brother's marijuana dealing and knew that he had amassed a large amount of cash, had committed the robbery. Aside from Richter's improper reference to her police statement, however, the evidence included her and Samantha's testimonies that upon the discovery of Roberts's body all three girls went into shock and did little more than call the police and wait for them to arrive. They had not seen the cash or removed it. There was no evidence of antipathy between Samantha and her brother and no evidence that after the crime any of the girls had had more money than usual. On the other hand, as noted above, there was proof that Winstead knew about Roberts's cash supply, was in dire financial circumstances, had several times remarked that he knew of a careless drug dealer who would be easy to rob, and that immediately after the crime had made a series of cash purchases far in excess of his usual income. In conjunction with the DNA evidence conclusively linking Roberts's blood with the clothes concealed in Winstead's apartment, the evidence was overwhelming that Winstead robbed as well as shot Roberts. There is simply no substantial possibility in this case that the verdict was swayed by the improper bolstering of Richter's testimony. The admission of that testimony was therefore harmless.

## CONCLUSION

In sum, Winstead has not adduced grounds for appellate relief. He was not denied his uninvoked right to conduct his own defense; he was accorded an adequate opportunity to question potential jurors about the case's racial circumstances; the trial court did not abuse its discretion by refusing to strike for cause a potential juror who stated that poverty and family background would not affect his sentencing decision; and, although Kayla Richter should not have been asked whether she made a prior consistent statement to the police, Winstead did not properly object to that testimony, and in any event its admission was harmless. Accordingly, we affirm the May 21, 2007 Judgment of the Daviess Circuit Court.

All sitting. All concur.

---

1. In several recent cases involving non-constitutional errors, *Anderson v. Commonwealth,* 231 S.W.3d 117, 122 (Ky.2007) has been cited for the proposition that the error would not be deemed harmless unless "there is no reasonable possibility that it contributed to the conviction." *Id.* at 122. In *Talbott v. Commonwealth,* 968 S.W.2d 76 (Ky.1998), however, we explained that the "no reasonable possibility" test is the harmless-error standard applicable to constitutional errors and is the equivalent of the "harmless beyond a reasonable doubt" standard announced by the United States Supreme Court in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The *Kotteakos* standard is the appropriate standard for non-constitutional errors.