# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: MAY 20, 2010
NOT TO BE PUBLISHED

Supreme Court of Kentucky

2008-SC-000837-MR

**FINAL**

DATE 06/10/2010

DARIEN J. DALTON                                                                  APPELLANT

V.

ON APPEAL FROM GRAVES CIRCUIT COURT
HONORABLE TIMOTHY C. STARK, JUDGE
NO. 07-CR-00039

COMMONWEALTH OF KENTUCKY                                          APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING**

Appellant, Darien J. Dalton, appeals as a matter of right[1] from a

judgment of the Graves Circuit Court convicting him of murder and wanton

endangerment and sentencing him to a total term of life imprisonment.

On appeal, Dalton alleges the following errors: (1) that the trial court

erred by excluding evidence relating to the victim's alleged prior commission of

a rape; (2) that the trial court erred by failing to give an extreme emotional

disturbance instruction; (3) that the trial court erred by permitting the

Commonwealth to play a recording of a prior consistent statement by a

mentally ill witness; (4) that the trial court erred by admitting the introduction

of cell phone records without proper authentication; (5) that the trial court

---

[1] Ky. Const. § 110(2)(b).

erred by admitting hearsay statements by Dalton's brother; (6) that error occurred as a result of the Commonwealth's displaying of enlarged autopsy photographs; and (7) that the prosecutor misled the jury in his penalty phase closing arguments by stating that Dalton would definitely be paroled after serving twenty years on a life sentence.

Finding no reversible error, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In the light most favorable to the verdict, the facts are as follows. Mary Thomas has two sons, Dalton and his older brother, James Dalton. James was friends with the victim, Gerald Pitman, and Dalton was acquainted with him.

On the evening of February 16, 2007, four young men invaded Thomas's apartment and held her at gunpoint. Thomas became hysterical and the men threatened to kill her if she did not be quiet. One of the men said "Where's your punk-ass son? I'm gonna kill him too." It is unclear what the exact purpose of the home invasion was. After a short while, Thomas managed to back up to the door, and escape from the apartment. She went to her next door neighbor's apartment and called her sons and the police, who quickly came to the scene.

From Thomas's detailed descriptions, police suspected that Pitman was one of the home invaders. Police prepared a photo-lineup and Thomas identified Pitman as one of the men who held a gun on her during the incident. Thomas remained upset as a result of the events, and there was testimony that

Dalton was likewise quite upset about the invasion.

The next morning, Dalton and James conspired to lure Pitman to James's trailer. Several phone calls were made between James and Dalton and James and Pitman. It was eventually arranged that James and his girlfriend, Jessica Hamilton, would pick up Pitman and his girlfriend, Ashley Anglin, and take them to James's trailer. Because James and Pitman were friends, it was not unusual for such an invitation to occur. The plan as told to Pitman was for James and Hamilton to drop off Pitman and Anglin at the trailer, and for Hamilton then to take James to work. Hamilton testified that she was aware that Dalton would be at the trailer when they dropped-off Pitman and Anglin, though she did not know Dalton was going to shoot Pitman.

With Hamilton driving, the plan was carried out. James and Hamilton dropped off Pitman and Anglin, and drove away. Pitman and Anglin then walked toward the back door of the trailer. As they approached, Dalton stepped from around the corner of the trailer and shot Pitman four times. The shots were fatal.

At about the time of the shooting, Tamario Morgan and his uncle arrived at the trailer. Both saw the shooter. Morgan testified that the shooter was wearing a camouflage coat. His uncle testified that the shooter was a young black male of medium build wearing what appeared to be a camouflage coat with a black toboggan under the hood.[2] As Dalton was making his getaway, an

---

[2] Dalton was 18 years old when the offense occurred, and the description given by Morgan and his uncle apparently fits Dalton.

acquaintance of Dalton, Kendrick Jackson, who suffers from schizophrenia, saw and recognized him. Jackson testified that Dalton was wearing a camouflage coat and jeans. Jackson had heard the shots and thought Dalton was running away from the shooter. Jackson was certain it was Dalton he saw that day.

On February 23, 2007, the Graves County Grand Jury indicted Dalton for Pitman's murder, and for first-degree wanton endangerment for shooting a firearm in the direction of Ashley Anglin.[3] Following a jury trial, the jury returned a guilty verdict on both charges. The jury recommended a life sentence on the murder conviction and a one-year sentence for the wanton endangerment conviction, to be served concurrently. On October 27, 2008, the trial court entered a final judgment consistent with the jury's verdict and sentencing recommendation.

This appeal followed.

## II. EVIDENCE OF THE VICTIM'S PRIOR RAPE CHARGE WAS PROPERLY EXCLUDED

It appears uncontested that in October 2002, Pitman was charged with the rape of a young girl, but was never brought to trial because he was adjudged incompetent to stand trial. Dalton claims to have known about these circumstances prior to the home invasion. Prior to trial, the trial court granted

---

[3] For his alleged participation in the shooting, James was likewise indicted for murder. The record reflects that prior to trial in the present case, James entered a guilty plea in his proceeding, though the ultimate outcome is not included in the record.

4

the Commonwealth's motion to exclude the evidence of Pitman's alleged rape charges and Dalton's knowledge of it from presentation to the jury.

Dalton contends that the trial court erroneously excluded the rape evidence. Dalton argues that the evidence was relevant to his state of mind because it contributed to his suffering from extreme emotional disturbance, which was triggered by Pitman's alleged home invasion of his mother's apartment. He argues that his knowledge of Pitman's alleged prior violent crime and escape from justice led him to believe that Pitman was "beyond the judgment of the law," which directly related to his extreme emotional disturbance defense.

Evidence of Pitman's 2002 alleged rape was, obviously, standing alone, inadmissible as irrelevant. KRE 401. Dalton does not contend otherwise.

As explained below, Dalton was not entitled to an extreme emotional disturbance instruction as a result of the home invasion against his mother, even when combined with his knowledge of Pitman's avoidance of criminal prosecution for the alleged 2002 rape. It follows that the evidence was not admissible in support of Dalton's extreme emotional disturbance defense.

In summary, the trial court did not abuse its discretion by excluding evidence relating to the alleged October 2002 rape.

### III. DALTON WAS NOT ENTITLED TO AN EXTREME EMOTIONAL DISTURBANCE INSTRUCTION

Dalton next contends that the trial court erred by failing to give an

5

instruction on first-degree manslaughter based upon extreme emotional disturbance.[4] Dalton alleges that he was entitled to an EED instruction based upon his reaction to Pitman's home invasion against his mother, in combination with his knowledge that Pitman allegedly escaped criminal prosecution for rape because he was adjudged mentally incompetent to stand trial.

In support of his theory that the home invasion was the event triggering his EED, Dalton cites us to the following testimony. Officer Jerry Gore testified that when Dalton arrived at his mother's apartment the night of the home invasion that Dalton "was upset," though as time passed he seemed to calm down "a little bit." Corporal Shannon Smith also testified that Dalton was "mad" and "extremely upset," that evening, though he calmed down before Smith left the scene. Thomas's neighbor Phil Mosley testified that Thomas was "very agitated and distraught" after the invasion and Dalton attempted to console his mother.

Dalton also cites us to his mother's testimony that Dalton stayed up all night with her because she was upset and crying and could not sleep. Thomas also testified that Dalton, too, was crying, and was assuring her it would be okay and that he "would take care of it".

---

[4] KRS 507.030 provides as follows: "(1) A person is guilty of manslaughter in the first degree when: . . . (b) With intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he acts under the influence of extreme emotional disturbance, as defined in subsection (1)(a) of KRS 507.020."

"In a criminal case, it is the duty of the trial judge to prepare and give instructions on the whole law of the case, and this rule requires instructions applicable to every state of the case deducible or supported to any extent by the testimony." *Taylor v. Commonwealth*, 995 S.W.2d 355, 360 (Ky. 1999). However, the trial court has no duty to instruct on theories of the case that are not supported by the evidence. *Payne v. Commonwealth*, 656 S.W.2d 719, 721 (Ky. 1983). An instruction on a lesser included offense is required only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense and, yet, believe beyond a reasonable doubt that he is guilty of the lesser offense. *Wombles v. Commonwealth*, 831 S.W.2d 172, 175 (Ky. 1992).

In *Greene v. Commonwealth*, 197 S.W.3d 76, 81-82 (Ky. 2006) we discussed the parameters of extreme emotional disturbance as follows:

> Although EED is essentially a restructuring of the old common law concept of "heat of passion," the evidence needed to prove EED is different. There must be evidence that the defendant suffered "a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from [an] impelling force of the extreme emotional disturbance rather than from evil or malicious purposes." *McClellan v. Commonwealth*, 715 S.W.2d 464, 468-69 (Ky. 1986). "[T]he event which triggers the explosion of violence on the part of the criminal defendant must be sudden and uninterrupted. It is not a mental disease or illness . . . . Thus, it is wholly insufficient for the accused defendant to claim the defense of extreme emotional disturbance based on a gradual victimization from his or her environment, unless the additional proof of a triggering event is sufficiently shown." *Foster v. Commonwealth*, 827 S.W.2d 670, 678 (Ky. 1991) (citations omitted). And the "extreme emotional disturbance . . . [must have a] reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint

of a person in the defendant's situation under the circumstances as the defendant believed them to be." [*Spears v. Commonwealth*, 30 S.W.3d 152, 155 (Ky. 2000)].

Thus, in order to receive an EED mitigating instruction, a defendant must present evidence which establishes adequate provocation, or a triggering event. *Benjamin v. Commonwealth*, 266 S.W.3d 775, 782 (Ky. 2008); *see also Fields v. Commonwealth*, 44 S.W.3d 355, 359 (Ky. 2001). Moreover, the provocation leading to the triggering event must be continuous and uninterrupted - though it need not necessarily be contemporaneous with the triggering event - and the courts should look to whether there was a sufficient "cooling-off period" which rendered the response unreasonable or the provocation inadequate. *See Benjamin*, 266 S.W.3d at 783.

An extreme emotional disturbance instruction must be supported by "some definite, non-speculative evidence." *Holland v. Commonwealth*, 114 S.W.3d 792, 807 (Ky. 2003) (quoting *Hudson v. Commonwealth*, 979 S.W.2d 106, 109 (Ky. 1998)). The trial court's decision not to give a jury instruction is reviewed for abuse of discretion. *Williams v. Commonwealth*, 178 S.W.3d 491, 498 (Ky. 2005).

As previously stated, Dalton's claim is that he suffered from EED as a result of the home invasion and the contemporaneous terrorizing of his mother, in combination with his knowledge that Pitman was previously charged with committing a rape and escaped punishment after being adjudged incompetent to stand trial. Accepting for discussion purposes that these factors were

8

sufficient to have so enraged, inflamed, or disturbed Dalton so as to overcome his judgment, and to have caused him to act uncontrollably from an impelling force, and thereby meet the threshold prong for establishing EED, nevertheless, there is insufficient evidence to establish that the force of EED remained uninterrupted until the shooting some fourteen hours later.

The testimony cited by Dalton, while describing him as being upset the night of the invasion, also describes him as having later calmed down. Moreover, Hamilton testified that Dalton seemed calm and okay when she and James left Thomas's apartment about an hour and a half following their arrival. Dalton himself did not testify, and so there is an absence of evidence concerning his mental state during the hours prior to the murder. Nearly fourteen hours elapsed between the triggering event and the shooting, which constitutes a sufficient "cooling-off period" under the circumstances presented here to render the response unreasonable or the provocation inadequate. *Benjamin,* 266 S.W.3d at 783. Moreover, the next morning Dalton engaged in somewhat elaborate planning to devise an ambush of Pitman, which is antethetical to the notion that Dalton's mind was so disturbed as to overcome his judgment and that he acted uncontrollably. Accordingly, there is insufficient evidence to support Dalton's theory that, if he committed the shooting, he did so under extreme emotional disturbance.

For the above reasons, this matter is distinguishable from our previous cases which hold that even if a defense theory is implausible, an instruction on

9

the theory must be given. *See, e.g., Taylor*, 995 S.W.2d at 360. Although we have cautioned that even implausible defense theories are entitled to instructions if there is an evidentiary basis for them, *id.*, we agree with the trial court that in this case, the evidentiary basis was lacking; and the court did not abuse its discretion in denying an EED instruction under the facts of this case.

## IV. KENDRICK JACKSON'S PRIOR CONSISTENT STATEMENT WAS IMPROPERLY ADMITTED, BUT THE ERROR WAS HARMLESS

Dalton next contends that the trial court erred by permitting a recorded prior consistent statement made by Kendrick Jackson on the day of the murder to be played at trial. Dalton alleges that the playing of the statement improperly bolstered Jackson's testimony. We agree, but conclude that the error was harmless.

Jackson testified that at the time of the shooting he was walking back to his residence after going to a store to purchase cigarettes for his cousin. Jackson was acquainted with Dalton, and during his trial testimony he referred to Dalton as his "friend." As he was walking home from the store he saw Dalton run through "the cut of the houses" wearing a camouflage jacket and jeans. Shortly thereafter he came upon the murder scene. Jackson was certain that it was Dalton he saw.

Jackson also testified that he had been diagnosed with schizophrenia in 2002 at Western State Hospital, a mental institution, where he was committed for about a week and a half. He was prescribed Zyprexa for his mental illness

10

and takes the medication daily, although he occasionally forgets to.[5]

On cross-examination, defense counsel questioned Jackson concerning the consequences of his mental illness and medication. Jackson testified that when he did not take Zyprexa, he did not see things clearly, might get things out of order or forget facts, and that he might experience a flash forward or backward. Jackson testified that when he was evaluated by the Social Security Administration for disability purposes, the evaluation showed that he had trouble remembering and concentrating. He denied, however, that he "imagined stuff." Jackson testified that while, on the day of the shooting, he took Zyprexa, he did so after, rather than before, the shooting.

Following cross-examination, the Commonwealth asserted that Dalton had attacked Jackson's credibility, and moved to play a tape-recording of the statement Jackson gave to police on the day of the shooting. The recorded statement was substantially similar to Jackson's trial testimony, and was thus a prior consistent statement. Ultimately, the trial court permitted the statement to be played "to show there's been no failure of memory between then and now."

KRE 801(1)(2) provides as follows:

(a) Prior statements of witnesses. A statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the declarant testifies at the trial or hearing and is examined concerning the statement, with a foundation laid as required by KRE 613, and the statement is:

---

[5] Prior to Jackson's trial testimony, upon Dalton's motion, a hearing was held to determine if he was a competent witness. The trial court ruled that Jackson was competent to testify at trial. Dalton does not challenge that holding.

11

. . . .

> (2) Consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive; or

"Under this rule and KRE 802 (the rule against hearsay), a witness's out-of-court prior consistent statement is not admissible merely to corroborate the witness's in-court testimony." *Winstead v. Commonwealth,* 283 S.W.3d 678, 688 (Ky. 2009).

*Bussey v. Commonwealth,* 797 S.W.2d 483 (Ky. 1990) contains similarities to this case concerning the admissibility of a prior consistent statement of a mentally impaired witness, the victim of the crime. In *Bussey,* the victim was severely retarded, but testified at trial concerning the sexual abuse committed by the defendant. During the Commonwealth's case in chief, four police officers were permitted to repeat the victim's prior consistent statement concerning what transpired. The Commonwealth argued that this testimony was properly admitted because the victim's credibility was attacked during cross-examination. In finding that the admission of the prior consistent statements was reversible error, we stated as follows:

> According to this theory, anytime the credibility of a witness is attacked, hearsay evidence which tends to corroborate the witness's story becomes admissible. This view of the law is much too expansive.
>
> The rule which permits rehabilitation of a witness is limited to those circumstances in which the credibility of the witness is attacked on the basis of a prior inconsistent statement, recent fabrication, improper influence, or some circumstance which

impairs his present ability to recall and narrate the event. *Eubank v. Commonwealth,* 210 Ky. 150, 275 S.W. 630 (1925), and *Reed v. Commonwealth,* Ky., 738 S.W.2d 818 (1987). The Commonwealth's reliance on *Lowery v. Commonwealth,* Ky., 566 S.W.2d 750 (1978), is misplaced. In that case, the witness was impeached by evidence that he had been drinking alcohol shortly before his testimony. In view of this circumstance, the court permitted rehabilitation of the witness by proof that he had earlier told a story consistent with his testimony at trial. The prior consistent statement was permitted because it disclosed that the story was the same as before the "onset of the malady."

Nothing contained in the facts presented here permits such a result. There was no contention of recent fabrication nor was there any evidence that the victim's mental condition had become diminished in the period between the occurrence of the crime and trial. He was cross-examined on the basis of the improbability of his story, his understanding of the difference between truth and falsity, and cross-examination generally was directed toward persuading the jury that it should not believe the victim's testimony. Merely challenging the truthfulness of a witness's testimony does not open the door to a parade of witnesses who repeat the witness's story as told to them. The law of Kentucky is well stated in *Eubank v. Commonwealth, supra,* as follows:

> "As a general rule, a witness cannot be corroborated by proof that on previous occasions he has made the same statements as those made in his testimony. Where, however, a witness has been assailed on the ground that his story is a recent fabrication, or that he has some motive for testifying falsely, proof that he gave a similar account of the matter when the motive did not exist, before the effect of such an account could be foreseen, or when the motive or interest would have induced a different statement, is admissible." *Id.* at 275 S.W. 633.

This case well illustrates the reason for the foregoing rule. The only witnesses to the occurrence of this crime were appellant and the Bussey brothers. To arrive at a conviction, it was necessary for the jury to believe the victim and disbelieve appellant. As such, the jury was required to determine the credibility of all fact witnesses. This process was flawed when four law enforcement

witnesses were permitted to bolster the victim's testimony by repeating what he had told them. Accordingly, we must reverse the conviction.

*Id.* at 484-485.

While trial counsel's cross-examination of Jackson did seek to highlight Jackson's mental shortcomings and suggest that because of his deficiencies he may have been mistaken in his observations of events, the casting of doubt on the reliability of an adverse eyewitness's observations is, generally, standard practice in cross-examination. However, as indicted by *Bussey,* there is no general exception to the rule against the admissibility of a prior consistent statement, in the case of a mentally impaired witness, "to show there's been no failure of memory between then and now."

As demonstrated by *Bussey,* mental impairment alone does not permit the use of a prior consistent statement to reinforce the in-court testimony of a mentally deficient witness. Trial counsel's cross-examination of Jackson did not suggest a recent fabrication or improper influence or motive. Nor did it suggest some circumstance which impaired his *present* ability to recall and narrate the event, thus this case is unlike *Lowery,* 566 S.W.2d 750, where the witness was drinking alcohol shortly before his testimony. To the contrary, the goal of the cross-examination was to suggest that Jackson's mental illness interfered with his perception of the event he claims to have seen. Accordingly, we find no basis for avoidance of the general rule against the admission of a prior consistent statement.

However, unlike in *Bussey,* where the error was reversible, in this case we do not believe reversal is warranted. RCr 9.24 requires us to disregard an error if it is harmless. A non-constitutional evidentiary error may be deemed harmless if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error. *Kotteakos v. United States,* 328 U.S. 750 (1946); *Winstead,* 283 S.W.3d at 688-89. The inquiry is not simply "whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Kotteakos,* 328 U.S. at 765; *Winstead,* 283 S.W.3d 688-89.

Even without the bolstering, Jackson's testimony was compelling evidence by an impartial witness placing Dalton as fleeing from the crime scene immediately following the shooting. Further, James's girlfriend, Hamilton, testified that she knew Dalton was to be at the trailer, which placed him at the scene of the ambush. Moreover, Dalton had a motive for the killing, the terrorizing of his mother by Pitman, and there appears to be no viable alternative perpetrator. As such, we are persuaded that the error did not have a substantial influence on the verdict and was, accordingly, harmless.

### V. THE CELL PHONE RECORDS WERE NOT PROPERLY AUTHENTICATED, BUT THE ERROR WAS HARMLESS

Next, Dalton contends that the trial court erred by admitting the cellular telephone records of Gerald Pitman, Mary Thomas, and Jessica Hamilton. He

15

alleges that the records were not properly authenticated.

A significant aspect of the Commonwealth's case against Dalton was evidence that there were several phone calls made the morning of the shooting between James and Dalton and James and Pitman. This evidence was presented both through James's girlfriend, Jessica Hamilton, and the cellular telephone records subpoenaed from Cingular Wireless. The inference to be drawn is that Dalton and James were coordinating to lure Pitman to the trailer for the ambush. There was testimony that Dalton was using the cell phone of his mother, Mary Thomas, and that James was using Hamilton's cell phone.

The cell phone records for Pitman, Thomas, and Hamilton were obtained from Cingular Wireless by subpoena, and were introduced through the testimony of Detective Bryan Morrison.

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." KRE 901(a). For purposes of authentication, the condition of fact which must be fulfilled by every offer of real proof is whether the evidence is what its proponent claims. *Johnson v. Commonwealth,* 134 S.W.3d 563, 566 (Ky. 2004). Part of the identification of evidence is a demonstration of its integrity - that it is in fact what its proponent claims it to be. *Rogers v. Commonwealth,* 992 S.W.2d 183, 187 (Ky. 1999).

The Commonwealth introduced the telephone billing records for the truth

of the matter contained therein; and, thus, the records must clear the hurdle for the admission of hearsay evidence. KRE 803(6) addresses the admissibility of business records under the hearsay rules. The rule states, as relevant here, as follows:

> The following are not excluded by the hearsay rules, even though the declarant is available as a witness:
>
> . . . .
>
> (6) Records of regularly conducted activity. A . . . record, or data compilation, in any form, of acts, events, [or] conditions, . . . made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness . . . .

Similarly, Professor Robert G. Lawson discusses the issue as follows:

> Business records are writings. Writings must be authenticated, i.e., accompanied by preliminary evidence sufficient to support a finding that they are what their proponents claim. This preliminary proof is commonly referred to as 'foundation.' KRE 803(6) requires 'testimony of the custodian or other qualified witness' concerning the prerequisites for admitting business records . . . . [I]t is 'essential' testimony without which business records 'must be excluded.'
>
> It is also well-settled that the foundation witness need not be the custodian of the records nor the person who made them. Anyone who can testify from personal knowledge about the circumstances surrounding the making and keeping of the records can qualify as a foundation witness. As stated by one authority, 'in the end the requirement may be satisfied by the testimony of anyone who is familiar with the manner in which the record was prepared, and even if he did not himself either prepare the record or even observe its preparation.'

Robert G. Lawson, The Kentucky Evidence Law Handbook § 8.65 (3d ed. 1993).

Here, the Commonwealth did not introduce the records through the testimony of a custodian of Cingular's call records, nor was Detective Morrison an "other qualified witness." Detective Morrison had no personal knowledge of how Cingular established or maintained records of its customers' calls, or any other competent knowledge which would allow him to attest to the verity of the telephone records. Nor did he have knowledge of specific calls or the length thereof, and nor were the self-authentication provisions of KRE 902(11)[6] followed by certification of the custodian. Because the records were not properly authenticated, their introduction into evidence was error. Nevertheless, upon consideration of the case as a whole, we believe the error was harmless.

Even without the records, Hamilton otherwise testified concerning the telephone calls James made and received that morning. Albeit in less detail, this established the same point made by the records. The exact times and lengths of the calls were not as important as the fact that the calls were being made and received. Thus, the cellular telephone records were cumulative to Hamilton's testimony.

---

[6] KRE 902(11) provides as follows: "Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following: (11) Business records. (A) Unless the sources of information or other circumstances indicate lack of trustworthiness, the original or a duplicate of a record of regularly conducted activity within the scope of KRE 803(6) or KRE 803(7), which the custodian thereof certifies: (i) Was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters; (ii) Is kept in the course of the regularly conducted activity; and (iii) Was made by the regularly conducted activity as a regular practice."

Jackson's testimony placed Dalton as fleeing from the crime scene. Hamilton testified that she knew Dalton was to be at the trailer where the shooting occurred. In addition, Dalton had a motive for the killing, and there appears to be no viable alternative perpetrator. As such, we are persuaded that the error did not have a substantial influence on the verdict, and was, accordingly, harmless. *Winstead,* 283 S.W.3d at 688-89.

## VI. THE HEARSAY STATEMENTS OF JAMES DALTON WERE PROPERLY ADMITTED

Next, Dalton contends that the trial court erred by permitting the introduction of hearsay statements (both direct and implied) made by James Dalton to his girlfriend, Jessica Hamilton. The trial court ruled that the statements were admissible under the hearsay exception for statements made in furtherance of a conspiracy.

During Hamilton's testimony the Commonwealth questioned her about the events of the morning of February 17, 2007, including James's phone conversations with Dalton and Pitman. The hearsay statements we are referred to (some implied) are (1) most importantly, that Hamilton knew that Dalton would be at the trailer (she could only have learned this through James' out of court statements); (2) that James directed her to drive to the trailer once they had picked up Pitman and his girlfriend; and (3) that James told her where to stop upon arrival at the trailer.

"A statement is not excluded by the hearsay rule, even though the

19

declarant is available as a witness, if the statement is offered against a party and is . . . [a] statement by a coconspirator of a party during the course and in furtherance of the conspiracy." KRE 801A(b)(5). In order to fall within this exception, however, the proponent of the statement must show (1) a conspiracy existed, (2) the conspiracy involved the defendant, and (3) the statement was made in furtherance of the conspiracy. *Gerlaugh v. Commonwealth*, 156 S.W.3d 747, 752 (Ky. 2005); *Marshall v. Commonwealth*, 60 S.W.3d 513, 520 (Ky. 2001). The prosecution must establish these three prongs by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 175, (1987). The trial judge must make the findings of fact necessary to determine whether these statements may be admitted. KRE 104(a); *Monroe v. Commonwealth*, 244 S.W.3d 69, 76 (Ky. 2008).

A conspiracy in this context is an agreement between two or more individuals to commit a crime. Lawson, Kentucky Evidence § 8.30[3]. For the coconspirator exception to apply there need not be a formal charge of conspiracy against either the party or the declarant. *Id.*; *see also United States v. Smith*, 596 F.2d 319 (8th Cir. 1979). Along with the requirement of an actual conspiracy, the statement offered must be "during the course and in furtherance of" such conspiracy. Lawson, *supra*. A conspiracy has commenced as soon as an agreement to commit a crime is reached, and is terminated when either there is an accomplishment of the objective or an unqualified and permanent abandonment of the objective. *Id.* As Professor

20

Lawson has noted, statements designed to advance the objectives of a conspiracy satisfy the "in furtherance" language of the statute. *Id.*

In connection with his ruling that the statements were admissible as statements made by a coconspirator, the trial court stated that "if nothing else" he could take judicial notice of James Dalton's guilty plea to the charge of complicity to murder Gerald Pitman. The record discloses that prior to the trial in the present case, James entered a guilty plea to complicity to the murder of Pitman. Whether that guilty plea precluded James from asserting his Fifth Amendment right not to testify in Dalton's trial was litigated in pretrial proceedings. Judge Timothy C. Stark presided as trial judge in both proceedings and would therefore have judicial knowledge of James's plea.

In light of the testimony that James helped to transport Pitman to the site of the ambush, as well as the Grand Jury's indictment of James for Pitman's murder under the probable cause standard and his subsequent entry of a guilty plea to complicity to the murder, which was in effect at the time of the trial, we conclude that a conspiracy was established by a preponderance of the evidence, and, accordingly, the hearsay statements were properly admitted as a statement by a coconspirator under KRE 801A(b)(5).

## VII. THE AUTOPSY PHOTOS WERE PROPERLY DISPLAYED TO THE JURY

Next, Dalton contends that two enlarged (describes them as "poster-size") autopsy photographs of Pitman were improperly displayed to the jury. At trial, Dalton objected to the photographs because of their size. He also alleges that

the photographs were displayed for the jury for an excessive length of time.

The photographs were introduced through the testimony of Officer Don Wortham. Wortham accompanied Pitman's body to Louisville for the autopsy, and collected evidence at the autopsy. The trial court admitted the two enlarged photographs over Dalton's objection, and the prosecutor placed them one at a time on an easel positioned in front of the jury. Officer Wortham left the stand, approached the easel, and testified that the pictures were a "true and accurate" depiction of what he observed at the autopsy. After Officer Wortham returned to the stand, the photograph remained visible for a period of time. The photographs were again displayed during the testimony of Donna Stewart, the medical examiner.

The Commonwealth is not permitted to introduce evidence which serves little or no legitimate evidentiary purpose other than to engender sympathy for the victim and his or her family. *See, e.g., Ice v. Commonwealth,* 667 S.W.2d 671, 676 (Ky. 1984).

We first note that the autopsy photographs of Pitman's fatal injuries were relevant to demonstrate that Pitman was, indeed, killed by gunshot wounds as stated in the indictment. KRE 401. Generally, such photographs are not excluded under KRE 403 as unduly prejudicial. As a general rule, photographs do not become inadmissible simply because they are gruesome. *Foley v. Commonwealth,* 953 S.W.2d 924, 936 (Ky. 1997). For example, a photograph of a young child victim, where his scalp was pulled back to show there was an

intent to kill, was not gruesome enough to preclude the photo evidence from the jury. *Quarels v. Commonwealth*, 142 S.W.3d 73 (Ky. 2004).

The photographs in question are not included in the record, so we are unable to evaluate their potential for prejudice. Nor are we prepared, as suggested by Dalton, to hold that prosecutors may not display enlarged autopsy photographs. Enlarged photographs facilitate medical experts in explaining injuries to juries as a group, and the practice has a legitimate evidentiary purpose. However, of course, gratuitous displays of gruesome photographs are to be avoided.

Further, Dalton's claims of prejudice relating to the enlargement of the photographs are speculative.

Dalton's claim regarding the length of time that the photographs were displayed is unpreserved. The pictures were displayed for about five minutes during Officer Wortham's testimony, and for about three minutes during Dr. Stewart's testimony. We cannot say that this amount of time was unreasonable, and Dalton presents no evidence to the contrary. There is no error here.

## VIII. THE PROSECUTOR'S COMMENT ON PAROLE ELIGIBILITY DURING PENALTY PHASE CLOSING ARGUMENTS WAS PROPER

Dalton's final argument is that the prosecutor misstated the law in his closing statement during the penalty phase when he stated "that appellant would definitely be paroled after serving 20 years on a life sentence." Dalton

concedes that issue is not preserved but requests palpable error review pursuant to RCr 10.26.

The statements Dalton alleges as error were as follows:

> With that life penalty, 20 years is gonna come up here, and you can't keep him in jail any longer than that. That's when he's gonna be eligible for parole . . . and he'll still be a young man maybe with a college degree when he gets out and Gerald Pitman's life is ended.

An examination of the prosecutor's statement discloses that he did not, as argued by Dalton, state "that appellant would definitely be paroled after serving 20 years on a life sentence." "Eligible for parole" does not equate to "will definitely be paroled."

Prior to the statement cited, the prosecutor discussed that a prisoner serving a life sentence became eligible for parole after twenty years and that the parole board would then have the decision on whether to release him, the point being that the jury could not impose a sentence which would assure that Dalton would remain in prison any longer than that.[7] In this context the prosecutor's statement was an accurate statement of the law. That is "you" - meaning the jury – "can't keep him in jail any longer than that" – meaning that they could not impose a sentence which would assure that Dalton would remain imprisoned for longer than twenty years.

While the statement was perhaps ambiguous, there was no error.

### IX. CONCLUSION

---

[7] The case was not tried as a capital case, and thus life without parole for twenty-five years and life without parole were not options.

For the foregoing reasons the judgment and sentence of the Graves Circuit Court is affirmed.

All sitting. All concur.


COUNSEL FOR APPELLANT:

Shelly R. Fears
Assistant Public Advocate
Department of Public Advocacy
100 Fair Oaks Lane, Suite 302
Frankfort, Kentucky 40601-1133


COUNSEL FOR APPELLEE:

Jack Conway
Attorney General

Susan Roncarti Lenz
Assistant Attorney General
Office of Attorney General
Criminal Appellate Division
1024 Capital Center Drive
Frankfort, Kentucky 40601-8204