RENDERED: JUNE 13, 2024
TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0094-MR

BILLY JO FAUGHN                                                    APPELLANT

ON APPEAL FROM TODD CIRCUIT COURT
V.          HONORABLE JOE W. HENDRICKS, JR., JUDGE
NO. 20-CR-00069

COMMONWEALTH OF KENTUCKY                                  APPELLEE

**OPINION OF THE COURT BY CHIEF JUSTICE VANMETER**

**<u>AFFIRMING</u>**

Billy Jo Faughn appeals as a matter of right[1] from a Todd Circuit Court judgment sentencing him to life imprisonment for wanton murder and operating a motor vehicle under the influence of methamphetamine. On appeal, Faughn raises four claims of error, none of which merit reversal. We therefore affirm the judgment of the Todd Circuit Court in all respects.

## BACKGROUND

The facts underlying this case stem from a tragic automobile collision that occurred on July 29, 2020. Faughn was in Hopkinsville, Kentucky to spend time with his family after the death of his father. After leaving the funeral home early on the day of the funeral, Faughn went to the home of

---

[1] KY. CONST. § 110(2)(b).

Gerald Harper, an individual known to local law enforcement to be a methamphetamine dealer. Four hours after leaving the funeral, Faughn was seen by Erica Skipworth traveling South on Blue and Gray Park Road. Skipworth, who was traveling the opposite direction, observed Faughn's vehicle traveling at a high rate of speed and veering into her lane of travel. As she got closer, she also noticed Faughn was slumped over the steering wheel. Skipworth turned around to follow Faughn's vehicle and called 911.

At the same time Faughn was seen travelling erratically, Sarah Barrow was outside tending to flowers in the front yard of her home off Blue and Gray Park Road. As Faughn neared Barrow's home, his vehicle left the roadway, traveled across a driveway, was briefly airborne, continued through a neighbor's yard, sideswiped a tree, ran over a fence post and bush, went airborne again, and sideswiped another tree. Barrow noticed Faughn's vehicle careening in her direction and retreated to her garage to seek shelter. Unfortunately, Faughn's vehicle continued in the direction of the garage. Faughn's vehicle struck Barrow and carried her through the sidewall of her garage, bringing her to rest approximately 39 feet from where the vehicle struck her. Barrow died from the injuries she sustained.

Detective Richard Carroll of the Kentucky State Police arrived at the scene shortly after the collision. Carroll spoke to Faughn and observed that Faughn appeared to be under the influence. At Carroll's request, Faughn performed Standard Field Sobriety Tests ("SFST") and exhibited signs of impairment in nearly every one. Faughn consented to a blood test. Later

2

examination of the blood showed the presence of methamphetamine in Faughn's system.  As a result of the collision, the Todd County Grand Jury indicted Faughn for wanton murder, operating a motor vehicle under the influence of methamphetamine, and possession of marijuana.  Following a four-day trial, a jury found Faughn guilty of wanton murder and operating a motor vehicle under the influence of methamphetamine.  Faughn was acquitted of possession of marijuana.  The jury recommended a sentence of life imprisonment, which the circuit court imposed.  Faughn now appeals as a matter of right.

**ANALYSIS**

Faughn raises three primary arguments for reversal of his sentence: (1) error from allowing some of the Commonwealth's witnesses to testify by Zoom; (2) prosecutorial misconduct; and (3) error as a result of admitting only a portion of a bodycam video.  Faughn further argues that even if none of these three alleged errors merit reversal, he is still entitled to a new trial because of the cumulative effect of those errors.  We address each contention in turn.

I.  Remote Testimony was Harmless Error.

Faughn first argues that the circuit court erred by allowing two of the Commonwealth's witnesses to testify by Zoom, a software platform that facilitates videophonic communication.  Faughn contends that allowing the witnesses to testify remotely deprived him of his right to confront the witnesses preserved under the Sixth Amendment of the U.S. Constitution and Section 11 of the Kentucky Constitution.

3

At trial, the Commonwealth sought to introduce evidence of the amount of methamphetamine present in Faughn's blood at the time of the collision. The Kentucky State Police Lab can determine the presence of a controlled substance in a blood sample but lacks facilities to quantify the amount of a drug in a person's blood. To remedy this issue, the sample was sent to a lab in Pennsylvania for analysis. Prior to trial, the Commonwealth moved to permit several individuals from the Pennsylvania lab to testify remotely, although ultimately only one testified at trial. The Commonwealth further moved to permit Mike Ward, a toxicologist at the University of Kentucky, to testify remotely.

As justification for their remote testimony, the Commonwealth indicated that allowing the lab employees testify remotely would save the state approximately $10,000 to $15,000 in travel and accommodation costs. As to Ward, the Commonwealth stated that because Ward is a professor at UK with an active teaching load, requiring him to travel to Todd County would force him to cancel some of his classes. Allowing Ward to testify remotely would vitiate that concern. The circuit court permitted Ward and any Pennsylvania lab employees to testify remotely.

This Court has recently addressed the question of remote appearances by witnesses in a criminal case in two opinions, *Campbell v. Commonwealth*, 671 S.W.3d 153 (Ky. 2023), and *Spalding v. Commonwealth*, 671 S.W.3d 693 (Ky. 2023). In those opinions, we expressed our skepticism as to the

4

continuing validity of the U.S. Supreme Court's opinion in *Maryland v. Craig*[2] in light of the demise of the balancing test set forth in *Ohio v. Roberts*,[3] which served as the analytical foundation of *Craig.* Despite skepticism we applied the *Craig* framework to an alleged confrontation clause error. Like *Spalding*, we again see no need to depart from the *Craig* analysis in the present case.

Pursuant to *Craig,* a defendant's right of confrontation is balanced against the competing public policy interests set forth by the Commonwealth. *Campbell*, 671 S.W.3d at 158-59 (citing *Craig*, 497 U.S. at 855). "'[T]he Confrontation Clause reflects a *preference* for face-to-face confrontation at trial,' a preference that 'must occasionally give way to considerations of public policy and the necessities of the case[.]'" *Craig*, 497 U.S. at 849 (quoting *Roberts*, 448 U.S. at 63; *Mattox v. United States*, 156 U.S. 237, 243 (1895)) (citation omitted) (emphasis in original). *See also Sparkman v. Commonwealth*, 250 S.W.3d 667, 669 (Ky. 2008) ("[W]hile face-to-face confrontation is preferred, the primary right secured by the Confrontation Clause is that of cross-examination. Accordingly, the right to confront is not absolute and may be limited to accommodate legitimate competing interests." (citing *Roberts*, 448 U.S. at 63; *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)) (footnote omitted). In addition to the presence of an important public policy underlying the request, remote testimony can only be allowed "where the reliability of the testimony is otherwise assured." *Craig*, 497 U.S. at 850.

---

[2] 497 U.S. 836 (1990).

[3] 448 U.S. 56 (1980) (overruled by *Crawford v. Washington*, 541 U.S. 36 (2004)).

The reasons proffered by the Commonwealth to explain why their witnesses needed to testify remotely fall well short of public policies that could outweigh Faughn's constitutional right to confront those witnesses. While we applaud the Commonwealth for their commitment to the financial well-being of Kentucky's prosecutorial system, a savings of ten to fifteen-thousand dollars cannot outweigh a defendant's constitutional rights. Similarly, while we can appreciate Ward's reluctance to cancel his classes and of the Commonwealth's efforts to accommodate Ward and his students, the relatively minor inconvenience to Ward does not in any way approach the gravity needed to deprive Faughn of his right to confront Ward in person. *See Campbell*, 617 S.W.3d at 161 ("Thus, by allowing [Commonwealth's witness] to testify via Zoom as a convenience to him, the trial court erred[]"). As noted by Faughn, if Ward wishes to engage in the business of testifying as an expert witness, he should be prepared to forego other obligations in pursuit of that endeavor. Accordingly, the circuit court erred in allowing the Pennsylvania lab employee and Ward to testify remotely.

However, finding a confrontation clause error is not, in itself, sufficient to justify reversal. Rather, "we must decide 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction . . . or put otherwise, that error was harmless beyond a reasonable doubt.'" *Campbell*, 671 S.W.3d at 161-62 (quoting *Talbott v. Commonwealth*, 968 S.W.2d 76, 84 (Ky. 1998)). "An assessment of harmlessness cannot include consideration of whether the witness' testimony would have been

6

unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence." *Coy v. Iowa*, 487 U.S. 1012, 1021-22 (1988).

Faughn was convicted of wanton murder. KRS 507.020 provides, in relevant part, "A person is guilty of murder when: . . . (b) Including, but not limited to, the operation of a motor vehicle under circumstances manifesting extreme indifference to human life, he wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person." No party disputes that Faughn operated a motor vehicle and as a result of his doing so he caused the death of another person. Primarily, the dispute at trial revolved around whether or not Faughn did so wantonly. Our statutes define "wantonly" as follows:

> A person acts wantonly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts wantonly with respect thereto.

KRS 501.020(3).

In this instance, we agree with the Commonwealth that the quantification of the amount of methamphetamine in Faughn's blood was cumulative of other properly admitted testimony. As previously noted, Skipworth testified to Faughn's high rate of speed and erratic driving.

7

Detective Carrol testified that Faughn's eyelids were droopy, his speech slurred, his statements incoherent, and that Faughn failed his SFSTs—all indicative to him that Faughn was under the influence of some substance. Although Kentucky is unable to quantify the amount of methamphetamine in an individual's blood, our labs can detect its presence. Bailey Gill of the Kentucky State Police Lab was able to do just that and confirmed the presence of methamphetamine in Faughn's blood at the time of the accident. Additional evidence showing that the accident could not have been caused by a tire blowout—one explanation Faughn provided—served to underscore that Faughn's vehicle leaving the road, travelling some 454 feet, and striking and killing Barrow was caused by Faughn's use of methamphetamine prior to operating his vehicle. The evidence presented by Pennsylvania lab and Ward quantified the amount of methamphetamine and explained more specifically how that amount would have affected Faughn, but merely reiterated to the jury a conclusion it could have reached from the other evidence: Faughn acted wantonly by operating a motor vehicle while high on methamphetamine. Accordingly, although the circuit court erred in allowing the lab employee and Ward to testify remotely, that error was harmless beyond a reasonable doubt.[4]

---

[4] Prior to the availability of chemical tests, Kentucky affirmed convictions for operating a motor vehicle in such a dangerous and careless manner that such operation led to the death of another. *See, e.g., Dunn v. Commonwealth*, 287 Ky. 622, 154, S.W.2d 707 (1941) ("[W]hen that evidence. . . is coupled with the straightforward testimony of several Commonwealth witnesses that Dunn was drunk or drinking and that whiskey was found in his car, we are forced to the conclusion that the verdict must be sustained[]"); *Newcomb v. Commonwealth*, 276 Ky. 362, 124 S.W.2d 486 (1939) ("The conditions may be such that one knows or should know that his conduct is reasonably calculated to injure or kill another. . ., and if under those conditions one

8

II.  The Commonwealth did not Engage in Flagrant Misconduct.

Faughn next directs us to several statements made by the Commonwealth during closing arguments that Faughn contends constitute prosecutorial misconduct.  Because Faughn failed to preserve a claim of error as to any of the occurrences, we will review each for palpable error.  RCr[5] 10.26.  Under RCr 10.26, we will reverse only,

> if the error is both palpable and affects the substantial rights of a party to such a degree that it can be determined manifest injustice resulted from the error.  For error to be palpable, it must be easily perceptible, plain, obvious and readily noticeable.  The rule's requirement of manifest injustice requires showing . . . [a] probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law.  Or, as stated differently, a palpable error is where the defect in the proceeding was shocking or jurisprudentially intolerable.  Ultimately, [m]anifest injustice is found if the error seriously affected the fairness, integrity, or public reputation of the proceeding.

*Young v. Commonwealth*, 426 S.W.3d 577, 584 (Ky. 2014) (internal citations and quotation marks omitted) (alterations in original).

Regarding what constitutes prosecutorial misconduct during closing arguments,

> This Court has repeatedly held that a prosecutor is permitted wide latitude during closing arguments and is entitled to draw reasonable inferences from the evidence.  A prosecutor may comment on tactics, may comment on evidence, and may comment as to the falsity of a defense position.  While the prosecutor has a duty to confine his or her argument to the facts in evidence, the prosecutor is entitled to draw reasonable inferences from the evidence, make reasonable comment upon the evidence and make a reasonable argument in response to matters brought up by the defendant.

---

operates an automobile with such a high degree of carelessness he is chargeable in a criminal prosecution with the natural and reasonable consequences of his conduct[]").

[5] Kentucky Rule of Criminal Procedure.

*Driver v. Commonwealth*, 361 S.W.3d 877, 889 (Ky. 2012) (internal citations and quotation marks omitted). "When reviewing claims of prosecutorial misconduct under our palpable error standard, 'we must focus on the overall fairness of the trial and may reverse only if the prosecutorial misconduct was so improper, prejudicial, and egregious as to have undermined the overall fairness of the proceedings.'" *James v. Commonwealth*, 681 S.W.3d 60, 74 (Ky. 2023) (quoting *Doneghy v. Commonwealth*, 410 S.W.3d 95, 106 (Ky. 2013)). With these principles in mind, we address each of Faughn's misconduct claims in turn.

a. *No error in commenting on absence of a medical episode.*

Faughn first argues that the Commonwealth committed misconduct in its discussion of Faughn's defense that the accident was the result of a medical episode that caused him to lose control of his vehicle. During its closing argument the Commonwealth commented on the occurrence, or lack thereof, of a medical episode on a handful of occasions. First, while addressing why Faughn did not claim to have had a medical episode during his initial encounter with the police, the Commonwealth stated, "Another thing to ask yourself is, why lie? If you're the Defendant [] and you have had some sort of medical episode—of which there's zero evidence, zero—if something happened and you blacked out, why wouldn't you say that?" Later, discussing Faughn's medical episode defense, the Commonwealth said,

> [Faughn's attorney] stands here in front of you and he wants to plant reasonable doubt, he wants to plant these seeds in your mind to make you think that Mr. Faughn, what he did wasn't as bad as we

10

all know it was.  And with no medical evidence he throws out acronyms like TIA [transient-ischemic attack].  No medical evidence whatsoever.  And the only discussion that came up with whatever that is seems to be something that comes on from being a meth addict.  Still a result of a choice that Mr. Faughn made.

The Commonwealth's argument about the absence of medical proof that Faughn suffered a medical episode was not prosecutorial misconduct.  The Commonwealth was correct that no witness testified that Faughn experienced a medical event that led to his losing control of the vehicle.  Where a medical episode was addressed, the evidence presented was either speculation by a lay witness[6] or discussed as a potential result of methamphetamine use.[7]  In neither case was a witness testifying that Faughn had indeed suffered a medical episode (aside from one secondary to Faughn's methamphetamine use that day) that led to the crash.  The Commonwealth's argument to the jury that no evidence was offered to prove a medical episode caused the crash was well within the latitude permitted for prosecutors during closing arguments.  Accordingly, the statements were not misconduct.

  b. *No error in describing Gerald Harper as a drug dealer.*

Next, we address whether the Commonwealth committed misconduct in describing Harper as a drug dealer.  During its closing the Commonwealth told the jury that Faughn was known to have left the house of a "drug dealer" in

---

[6] When Skipworth saw Faughn slumped over the steering wheel, she believed in could be the result of a medical emergency.

[7] Ward, the Commonwealth's toxicologist, testified on cross examination that methamphetamine use can cause vasoconstrictive disease which can lead to stroke or heart attack.

11

reference to Harper's home, prior to the crash. Later, the Commonwealth described Harper to the jury as "a drug dealer—a meth dealer." Faughn argues that because the Commonwealth never introduced evidence of a conviction of Harper for drug trafficking, those statements were improper.

Faughn is correct that the Commonwealth never introduced concrete proof that Harper trafficked methamphetamine from his home. However, the Commonwealth did provide the testimony of Detective Carroll who informed the jury he was aware of Harper from "prior narcotics charges, trafficking, possessions, that type of stuff." Further, testimony from Faughn's mother indicated that Faughn was not under the influence of narcotics that morning. Given that Faughn was undeniably under the influence of methamphetamine at the time of the crash (after he left Harper's home) and Harper's reputation among law enforcement for drug activity, the Commonwealth made the reasonable inference that Harper had indeed sold methamphetamine to Faughn, making Harper, colloquially speaking, a dealer of that substance. Because "the prosecutor is entitled to draw reasonable inferences from the evidence", *Driver*, 361 S.W.3d at 889, the Commonwealth committed no error in making that statement.

c. *No error in describing reckless homicide as a slap on the wrist.*

Next Faughn argues fault with the Commonwealth's portrayal of reckless homicide as leading only to a "slap on the wrist" for what occurred. This comment was made in response to Faughn's argument that Faughn's

12

methamphetamine use made it difficult for him to appreciate the danger of operating a vehicle. The Commonwealth contended:

> He was at Gerald Harper's house and he has four hours to get high. Do you need to know how high he got? Do you need to know how much he smoked? Do you need to know exactly how he was feeling? Do you need to know if he was in euphoria or if he was in crash? Do you need to know what his metabolism is? Do you need to know what he did for the days leading up to that? No. There's no question he was under the influence of methamphetamine. And what [Faughn] is asking you to do is say, "he was high and what he did was bad, but it wasn't that bad. Just reckless. Let's just slap him on the wrist for killing somebody."

The Commonwealth made later references to lesser charges in much the same manner, as a "slap" or "smack" on the wrist.

In *Norton v. Commonwealth*, 37 S.W.3d 750, 753 (Ky. 2001), we reiterated, "that sentencing issues must not be raised prior to the penalty phase of trial as a means to impermissibly influence the jury to convict based on the desired penalty rather than on the elements of each given offense." However, we also explained that this prohibition is malleable based on the context of statements. *Id.* Where, as in *Norton*, the defense strategy was to admit most of the underlying facts but to seek conviction for a lesser charge, the Commonwealth was permitted to discuss sentencing in its closing argument. *Id.*

Here, we are presented with a situation that does not run afoul of this rule. In his closing statement, Faughn argued in part that he was guilty only of reckless homicide because he failed to perceive the danger of his methamphetamine use. As a result, the Commonwealth was entitled to comment upon why Faughn would be willing to admit some degree of guilt. In

13

doing so the Commonwealth did not delve into the sentencing implications of the lesser charges, indicating only that they would represent a "slap on the wrist" in light of the Commonwealth's theory of the case. While this comment undoubtedly raised the sentencing in the minds of the jury, and presents a close question for the court, we hold that in light of Faughn's complementary argument and the vagueness of the Commonwealth's statements, the Commonwealth did not commit misconduct in making those comments.

d. *No error in commenting on Faughn's desire for a jury trial.*

Faughn's next claim of prosecutorial misconduct arises from comments the Commonwealth made that included a passing reference to Faughn's invocation of his right to a jury trial. In its closing, the Commonwealth argued:

> If only he had stopped using. If only for one day. If only he had stayed at the funeral. If only he'd gone to the cemetery to bury his own father, with his family, with his daughter, with his grandchildren, with his mother, and his sisters. If only. If he had done that, then Mrs. Barrow would have finished the yard work. She would have gone to church, and tomorrow she'd be celebrating her husband who served this country, so people like Mr. Faughn can drive around and exercise freedom and come in here and demand a jury made up of his peers.

The Commonwealth is prohibited from commenting on the valid invocation of a constitutional right. *See Griffin v. California*, 380 U.S. 609, 614 (1965) (prohibiting comment on defendant's right to remain silent); *Commonwealth v. McCarthy*, 628 S.W.3d 18, 36 (Ky. 2021) (prohibiting proof of defendant's refusal to warrantless search and seizure). Our caselaw contains a dearth of opinion touching upon prosecutor's comment on a defendant's exercise of his or her right to trial by jury, but in *Hodge v. Commonwealth*,

14

2019-SC-000159, 2020 WL 2091819 at *7 (Ky. April 30, 2020), we found the Commonwealth's statement that a defendant sought a jury trial in order to "game the system" to be misconduct.

Taken in context, we hold the Commonwealth's mention of Faughn's invocation of his jury right not to be a comment upon that invocation. As with the "slap on the wrist" statements, this comment presents a close call, but we find it to be distinguishable from *Hodge*. In *Hodge*, the reference to the defendant's invocation of a jury trial as "gam[ing] the system" was made in relation to his co-defendant's choice to take responsibility for their role in the crime. *Id.* Accordingly we found it improper for the Commonwealth to both "comment on Hodge's exercise of his constitutional right to a jury trial and refer to that exercise" in a derogatory way. *Id.*

Contrastingly, the reference to Faughn's desire for a jury trial was not derogative, but rather neutral. We have previously held that comment upon a defendant's invocation of another constitutional right violates a defendant's rights "only when it was manifestly intended to be, or was of such character that the jury would necessarily take it to be, a comment upon the defendant's failure to testify . . . or invited the jury to draw an adverse inference of guilt from that failure." *Ragland v. Commonwealth*, 191 S.W.3d 569, 589-90 (Ky. 2006) (discussing a comment on a defendant's failure to testify) (internal citation omitted). The comment made here was not of the character described in *Ragland* because it was not "of such character that the jury would necessarily take it to be, a comment upon" Faughn's decision to proceed to

15

trial, nor did it invite the jury to draw an adverse inference from that choice.

The comment was a neutral observation linking the military service of the

victim's husband to upholding a criminal defendant's right to a jury trial.

Because the comment was not of such character as to draw negative attention

to the invocation of Faughn's right to a trial, we hold the Commonwealth

committed no misconduct.

    e. *No error in the discussion of the jury instructions.*

    Faughn's penultimate claim of misconduct argues that the

Commonwealth gamed the creation of the guilt-phase jury instructions to

suggest to the jury it could ignore the lesser-included offenses in their

deliberation. Faughn does not argue the instructions themselves were infirm;

rather he simply suggests the Commonwealth improperly directed the jury in

how to move through the instruction as it deliberated and as a result violated

his presumption of innocence.

    The instructions tendered to the jury were arranged such that a verdict

form was placed immediately after each offense. During its closing, the

Commonwealth suggested to the jury:

> When you go back, my suggestion is you're [going to] elect a
> foreperson. And if I were your foreperson, what I would do when I
> start is I would get a show of hands from everybody, I would say,
> who here is in favor of murder. Find out where you are right from
> the beginning. You all have sat, and you've heard the case, you have
> your thoughts, you've reviewed all the evidence, it's all in, you have
> your thoughts, you've got your wheels spinning. When you go back
> there, the foreperson, the first thing you need to do is ask everybody,
> who here is ready to find the defendant guilty of murder. See how
> many you've got. If you've got 12, it's guilty and you move on to the
> next charge. If you have less than 12, that's where you need to talk
> about it. That's where you need to talk about the evidence, answer

16

each other's questions. You can come out here and review the bodycam, you can listen to the audio, you can look at pictures. We can accommodate about anything you need to review, to get your questions answered. And this is what I would say, I believe some if not all of you have already, after hearing the evidence, you're ready to deliver a verdict of guilty on murder. And there may be some people who are on the fence. For the people who have already had this burden of proof satisfied in your mind, that you've already reached a guilty verdict, from the evidence it's already there. Hold your ground. Hold your ground. You've seen the truth. You've seen the evidence, and you know what this is. It's murder, hold your ground on that. Answer the questions, talk with each other.

Faughn argues that this statement led the jury to key in on the initial charge of murder and not consider the lesser offenses. We disagree. Certainly, the Commonwealth's suggestion would have the effect of shortening deliberations by having the jury move on to the non-murder charges if unanimity could be reached at the outset. However, the Commonwealth did not mislead the jury into ignoring the lesser-included offenses. The Commonwealth acknowledged that unanimity may not occur initially and implored the jurors to discuss the evidence until they reached agreement on one of the charges. The jurors were also aware of the lesser-included offenses as options because they were walked through the entirety of the instructions—including a statement regarding Faughn's presumption of innocence—by the circuit court prior to deliberation. The Commonwealth's suggestion no more shifted the burden of proof to Faughn than any other time the Commonwealth made clear its position on Faughn's guilt. The Commonwealth's suggestion to the jury was not misconduct.

17

f. *No error in discussing parole during the penalty phase.*

Finally, Faughn argues that the Commonwealth committed misconduct by directing the jury to consider Faughn's parole eligibility. During its penalty phase closing, the Commonwealth said,

> So, what I would say to you is, the life sentence will do this for Mr. Faughn. He will see the parole board in 20 years, that is three years after he would see the parole board on the minimum sentence of 20 years. You need to assume that he will be paroled in 20 years. You need to assume that. You need to assume that at his age that after 20 years in prison that they will hear what they need to hear to let him out and that he will be out, and he will be able to drive and go and do as he pleases, under the supervision of a parole officer. And the life sentence will do this for him. If he does what he needs to do when he gets out on parole, if he does what he needs to for the rest of his life, he won't see another day in prison. But if he messes up, he'll be under supervision for the rest of his life for those parole officers. They can make sure that he gets the help that he needs. That if he's in trouble, if he needs to be back in prison, they can make sure that that happens.

Faughn argues that because he is not guaranteed to be paroled in 20 years, the statement had the effect of misadvising the jury as to the legal effect of its verdict.

As a general matter, Faughn is correct that he is not guaranteed parole at his first hearing. *Ruppee v. Commonwealth*, 754 S.W.2d 852, 853 (Ky. 1988). But, he is incorrect in suggesting that the Commonwealth misadvised the jury. Defendants sentenced to life do indeed go before the parole board after 20 years. KRS 439.3401(2). The Commonwealth did not state that Faughn *will* be paroled at that time, only that he *may* be and the jury should assume that he would be paroled. The Commonwealth stated the law accurately and provided the jury with a roadmap for Faughn's future

18

relationship with the correctional system if it gave him a life sentence. We hold the statement was not misconduct.

III.    Admission of the Bodycam Video was Harmless Error.

Faughn next argues the circuit court erred in admitting a portion of Officer Mitch Frazier's bodycam recording of the immediate aftermath of the collision. The bodycam footage depicted Barrow dying on the ground in her yard after the accident. Faughn argues that because he and the Commonwealth had agreed to stipulate to the medical examiner's report—which states Barrow died from blunt force injuries—that admission of the beginning of the bodycam video, which primarily contained footage of Barrow laying on the ground in her yard prior to her death, was prejudicial and not probative of a contested fact. Because Faughn objected at trial to playing the offending portion of the video, we review for abuse of discretion. *See Burdette v. Commonwealth*, 664 S.W.3d 605, 617 (Ky. 2023) ("This Court reviews a trial court's decision regarding the admissibility of evidence for an abuse of discretion[]"). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.* (quoting *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999)).

As an initial matter, Faughn contends that the circuit court erred by not reviewing the disputed portion of the video prior to making its ruling as to admissibility. Given this Court's recent precedent addressing the necessity for the trial court to view disputed evidence prior to ruling on its admissibility, we

agree with Faughn that the Court erred by not viewing the beginning of the bodycam video prior to allowing its admission. *See Carpenter v. Commonwealth*, 681 S.W.3d 36, 40-46 (Ky. 2023) (detailing our recent precedent on KRE 403 and the need for judges to review disputed evidence, concluding the trial court abused its discretion by admitting evidence it had not reviewed because, "[t]he trial court needed to know what was in the videos to assess the potential prejudice to Carpenter against the evidence's probative value and properly exercise its discretion under KRE[8] 403[]").[9]

Nevertheless, we hold the error did not have substantial influence on the outcome of Faughn's trial.

> A non-constitutional evidentiary error may be deemed harmless, . . . if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error. The inquiry is not simply "whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

---

[8] Kentucky Rules of Evidence.

[9] The Commonwealth argues that *Carpenter* is distinguishable because the Commonwealth "narrated" the opening portion of the video to the circuit court. However, *Carpenter* in part draws from an unpublished Court of Appeals decision, *Purdom v. Commonwealth*, No. 2014-CA-002079-MR, 2016 WL 2586080 (Ky. App. Apr. 22, 2016), that presented a similar fact pattern: defendant objected to portions of videos; the circuit judge did not view the videos, but the Commonwealth described their content; and the videos were played for the jury. We agreed with the Court of Appeals' holding in *Purdom*, and the situation here presents little difference. This is true whether the videos were of child pornography or of an accident victim who lay dying on her lawn—to paraphrase *Carpenter*, KRE 403's application is not limited to images or videos of child pornography or evidence that is not itself the crime. *Carpenter*, 681 S.W.3d at 43 (discussing *Hall v. Commonwealth*, 468 S.W.3d 814 (Ky. 2015), and noting with approval that "*Hall*'s comprehensive explanation of KRE 403's application is not limited to the gruesome murder and autopsy photos or evidence that is not itself the crime[]").

*Carpenter*, 681 S.W.3d at 46-47 (quoting *Winstead v. Commonwealth*, 283 S.W.3d 678, 688–89 (Ky. 2009)). The situation here differs from *Carpenter*. In *Carpenter*, the un-reviewed evidence that the trial court admitted—portions of five videos containing child pornography—had a direct connection to the differing sentences Carpenter received for knowingly possessing pornographic images (thumbnails of videos) and for possessing the videos themselves. *Id.* In Faughn's case, the effect of admitting the un-reviewed opening of Officer Frazier's bodycam video is not so clear. The only charge to which the video relates is Faughn's conviction for wanton murder. The evidence against Faughn as to that charge was overwhelming: an eyewitness watched his vehicle leave the road and strike Barrow; and blood tests confirmed the presence of narcotics in his system immediately after the crash. The existence of these facts alone could have supported the jury's verdict and sentence. We can say with fair assurance that the jury also seeing video of the immediate aftermath of the crash and of Barrow's final moments would not have made a significant difference in the outcome of the case. Accordingly, the error did not have a substantial influence on Faughn's case, and the error in admitting the video was harmless.

Further, although the circuit court erred in not viewing the video prior to admission, our rules of evidence were not violated by the video's contents. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401.

21

"This standard is powerfully inclusionary and is met upon a showing of minimal probativeness." *Roe v. Commonwealth*, 493 S.W.3d 814, 820 (Ky. 2015). The video of Barrow laying on her lawn following the collision meets the low bar we have set for relevancy. Although the abstract fact and mode of Barrow's death can be established by the medical examiner's report, the video was relevant to demonstrating that the blunt force injuries that caused Barrow's death were caused by Faughn's vehicle. *See Hunt v. Commonwealth*, 304 S.W.3d 15, 40-41 (Ky. 2009) (finding no error in admitting autopsy photos even though no challenge was made to introducing the medical examiner's report because "The autopsy photographs . . . were relevant to demonstrate that [the victim] was, indeed, killed by gunshot wounds as stated in the indictment[]").

Although relevant, the video may be excluded "if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." KRE 403. In determining the admissibility of relevant evidence, the circuit court must "[f]irst . . . assess the probative worth of the proffered evidence; second, it must assess the risk of harmful consequences (i.e., undue prejudice) of the evidence if admitted; and last, it must evaluate whether the probative value is substantially outweighed by the harmful consequences." *Hall v. Commonwealth*, 468 S.W.3d 814, 823 (Ky. 2015).

"[T]he Commonwealth may 'prove its case by competent evidence of its own choosing, and the defendant may not stipulate away the parts of the case that he does not want the jury to see'", *Hall*, 468 S.W.3d at 825 (quoting *Pollini v. Commonwealth*, 172 S.W.3d 418, 424 (Ky. 2005)), although the Commonwealth's ability to introduce evidence "is not without limit." *Id.* at 825. The full video is undoubtedly heartbreaking, but "general gruesomeness by itself, while prejudicial, is an insufficient ground to keep out relevant evidence[.]" *Id.* at 824. In this instance, the bodycam video of the immediate aftermath of the collision was, as the Commonwealth argued, the best evidence of the scene moments after Barrow had been struck. Apart from showing Barrow in the final moments of her life, it also illustrated the physical relationship between her body, her semi-demolished garage, and Faughn's vehicle in a way that the testimony of her husband or of the responding officers could not.

We have addressed similar situations where the objected to evidence was in the form of autopsy photographs admitted where no dispute existed about how the death occurred. In *Hunt, supra,* the defendant objected to the admission of autopsy photographs where he had not opposed evidence that the victim had been shot to death and did not oppose the medical examiner's testimony about the wounds. *Hunt*, 304 S.W.3d at 40. We held that the autopsy photographs were relevant and not excluded under KRE 403:

> As a general rule, photographs do not become inadmissible simply because they are gruesome. Such evidence loses its admissibility when the photographs begin to depict a body that has been

23

"materially altered by mutilation, autopsy, decomposition or other extraneous causes, not related to commission of the crime, so that the pictures tend to arouse passion and appall the viewer." We agree with Hunt that the autopsy photographs were gruesome; however, the threshold is much higher than mere gruesomeness for a photo to be inadmissible. For example, a photograph of a young child victim, where his scalp was pulled back to show there was an intent to kill, was not gruesome enough to preclude the photo evidence from the jury. In another case, a videotape of the murder scene showing burned bodies of victims, as well as numerous photographs depicting the same were an accurate description of the crime scene and were properly admissible. The autopsy photographs were properly admitted because they depicted Bettina's injuries accurately and were not so gruesome so as to preclude the photograph from evidence. There is no error here.

*Id.* at 41 (citations omitted). We can discern no reason to treat the bodycam video recording any different. The video of Barrow was not materially altered such that it would arouse passion and appall the jury, the video was probative of the scene of the collision immediately after its occurrence, and although certainly prejudicial to Faughn, its probative value outweighed whatever prejudice the video engendered. The video's admission was proper insofar as our rules of evidence are concerned.

IV.    The Errors were not Cumulative.

Finally, Faughn argues that even though none of the errors present in his trial individually mandates reversal, the cumulative effect of those errors does. The doctrine of cumulative error provides that,

multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair. We have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial. Where . . . none of the errors individually raised any real question of prejudice, we have declined to hold that the absence of prejudice plus the absence of prejudice somehow adds up to prejudice.

24

*Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010) (citations omitted). Here, although we have identified errors in the trial, none of those errors bordered on the prejudicial. As we have already discussed, the evidence against Faughn was substantial, and even in the aggregate the prejudicial effect of the errors did not render Faughn's trial fundamentally unfair. Accordingly, we will not reverse on this basis.

## CONCLUSION

Based upon the foregoing, the judgment of the Todd Circuit Court is affirmed.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Travis Bewley
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

J. Grant Burdette
Assistant Attorney General